Consolidated, numbers 21-2013 and 21-2016Claire Hickey v. University of Pittsburgh and Ryan v. Temple University. Mr. Lynch? Yes. May it please the Court, my name is Gary Lynch, and I represent the appellants in this consolidated appeal. Your Honors, may I reserve five minutes for rebuttal? Granted. Unless the Court has another preference, I'm just going to give my presentation on behalf of both appeals at the same time. Your Honors, the universities here are pressing a misinterpretation of Pennsylvania contract law by asserting that there must be a specific and identifiable promise in the written materials published by the universities. There is no case law in Pennsylvania that forecloses an implied contract theory in a student-university context. And there's no case law that limits in any way the sources from which a promise may be inferred in a university-student context. The student-university relationship is governed by normal Pennsylvania contract law. In an implied contract, courts can look to the overall circumstances, including the course of dealing, and the common understanding of human beings to show mutual intention to contract. Pennsylvania law in this regard, and in the setting of a student-university context even, is the same as it is in most other states, if not all. But to be fair, much of your argument as to what promises were made in the implied contract context does come from written materials as well, right? Brochures and... It sure does, Your Honor. It sure does. In Pennsylvania, law doesn't help you much when it comes to promotional materials. The law as written, the case law seems to protect sort of puffery and advertising, all that sort of thing. I think puffery is probably protected always, even outside of this context. But I would venture to suggest that even the Swartley case, which seems to be trumpeted as... No, you do an excellent job in the briefing of explaining how that's about academic freedom. She was denied a PhD. This is different. This is kind of an on-off switch. You're arguing that you're entitled to in-person. But the problem I'm having with that argument is that when you look at the governing contract, let's start with the Pitt contract, it says educational services. So, you know, there was mutuality of obligation. It wasn't just that you were allowed to register, you being your clients. In exchange for your clients registering and being provided educational services, your clients had to pay tuition. That was the deal. And I don't see where in-person... Clearly, the expectation everyone had, I think, the other side admits in both briefs that they wrote, the expectation absolutely was for an on-campus experience. The problem is the contract never promised your clients an on-campus experience. Well, Your Honor, my response to that is this isn't the contract. This is not the complete contract of the educational... It's not a contract at all or it's... It may arguably be a contract in and of itself on the topic of payment by the students. What about provision of educational services? That only appears one time and it's just a reference to... in the promissory agreement sentence, basically. So the promissory note agreement, i.e. financial obligation in the form of an educational loan, is defined by the U.S. Bankruptcy Code in which the university is providing me educational services, deferring some or all of my payment obligation for those services. Educational services could mean literally anything. It could mean literally nothing. It could mean in person. It could mean online. It could mean under a tree. It could mean in a classroom, in a laboratory. It could mean a lot of things. It could mean here's a nice reading list. You should check these books out. I'll see you later. Reading list doesn't sound like a service. It's a reading list. Service, I think a court would interpret service to mean that some person is providing a service, not just telling you to go read something. But, Your Honor, I think you put your finger right on it when you started to say a court could interpret. What could the court really interpret from that word in this context without looking beyond the contract? Credits, degree. I mean, that's what they got. I mean, I think the other side was candid. Your clients got a substandard product compared to what they expected. But I don't know that they were promised. And maybe we should pivot to Temple because one of the things that's interesting to me about the case is that the Pitt agreement is tighter from the university standpoint because it's a fully integrated agreement. I didn't see Temple indicating it was fully integrated, nor did I see the phrase educational services in the Temple agreement. Does that mean you have a much stronger argument in the Temple case than the Pitt case? Well, it's ironic that I do, Your Honor, because in that decision the court relied 100 percent on that document to exclude any allegations of an implied contract. Right. And in the district judge's opinion, he frequently referenced registration. Right. And, boy, that's a tough argument, I think. If Temple is going to make the argument that your clients had to pay tens of thousands of dollars for the privilege of filling out a registration form, I don't know where that's going to sell. Your Honor, I 100 percent agree with that, but I have to tell you I don't think that there's as much daylight between these two cases on this issue as you're suggesting. Yeah, why? Respectfully. Because I don't think that the phrase educational services and with the rest of the agreement focusing 100 percent on the payment provisions, the payment obligations, the payment consequences, and the consequences for not paying by the student, this document, this one-page document, is 100 percent about the obligations of the student. No, that's not true. That would be. Pitt has to provide educational services. It doesn't actually say that. That would be an implied contract on Pitt's part from what it says there. There's nothing there that says Pitt is promising to do anything. It's inferred from that phrasing of the phrase educational services. But even if you could reasonably infer that. It says receipt of educational services. Well, they're not receiving it from the ether. They're receiving the educational services from the university. Yeah, and I'm not against. So Pitt has to provide that. And we're not against making logical inferential conclusions from the dealings of the parties and the writings of the parties. But you can't do it one way. We can't imbue this with any sense of meaning on the obligation of the University of Pittsburgh without drawing some inferences up from logic and common sense, correct? So why can't we do that beyond that? Unless it's the district court thought it was precluded from doing so by Swartley, and that's sort of how you back into this thinking about this as a closed universe of obligations because it can't be anything else because of Swartley, except that isn't the best reading of Swartley because that deals with educational quality. Why is this a motion to dismiss it all is something I'm puzzled by. It strikes me that these are the kinds of evidence-bound, fact-specific claims that are best considered on a motion for summary judgment, and yet the district court proceeded to treat this as a motion to dismiss. I 100% agree with you on that. I don't know. I mean, my first sentence in my notes was actually going to be this is a case, these are cases that should not have been decided at Rule 12, in either instance. But the problem was there was an incorrect legal precept being applied by the district court in the Pitt case and a misapplication of a legal precept in the Temple case to conclude that that was a fully integrated contract. So for those two legal errors, there wasn't a fair reading of either complaint or permission of the parties to move forward with appropriate discovery. Well, but how can you argue persuasively that the Pitt contract is not fully integrated when it says right in there it has a standard integration clause? Well, that's not dispositive of whether something's fully integrated or not. And when you look at this agreement and you see, so there's two arguments, Your Honor. The first one is this is not fully integrated with regard to anything else other than the obligations of the student to make payments. I mean, the substance of it, if you read it, is about permitting the school to call the student on their cell phone. I mean, there's a lot of details here, but none of them pertain to Pitt. It says, I'm looking at the language, the last paragraph, right? It says the entire agreement between the parties with respect to the matters described. The matters described include the receipt of educational services by your clients. I disagree that the matters described involve anything about the receipt of educational services other than the sentence that we've been talking about and the phrase educational services. Well, then what to what does matters described refer? Matters described refers to the matters described in this document only, but not to the entire relationship between the student and university. I didn't say the entire relationship. I said educational services because educational services is specifically referenced. That phrase is definitely there. I'm not going to deny that. But it cannot in and of itself. The bargain was you pay tuition fees and other associated costs, and I, the university, allow you to register and receive services. Yep. And every case, most cases, even the appellate courts in the federal system that have looked at this issue, have concluded that the universities that have this type of a language, protecting the payment from the students to the universities, that these documents do not stand on their own, that to understand the real contract that exists between the students and the university, you have to look at a whole swath of documents, first of all. And for an applied contract like the one we're trying to enforce, you have to go beyond that. But what are the other documents that are part of the contract between your clients and Pitt? Well, for the overall contract, it would include all the promotional materials, the bulletins, everything else that we've alleged in the complaint as it relates to the in-person education. So the promotional materials are part of the contract? In an implied contract. When the brochure says, you know, we've got this really nice gym, when the student shows up and the gym is under renovation or construction, it's a breach of contract by the university. No, because I don't think that it pertains to something that narrow. Unless I misheard your example. It doesn't have to be that every single detail of what Pitt is going to do for the students is set in stone. That's the whole nature of implied contracts. And having this discussion with the court. It just sounds so fluid. It doesn't sound like a contract. It sounds like some sort of dialectic between student and university that is so fluid. Your Honor, well, respectfully, what it sounds like is a question of fact. It sounds like a question of fact for the jury to look at and understand the course of dealings between the parties, the history, the mere fact that for 300 years people went to college. But then you just wrote the integration clause out of the Pitt contract. This is not the. The whole purpose of integration clauses is to train the court's attention on the language of the document rather than all of those other things you just mentioned. Right. Except this is not the Pitt contract. It may be integrated for this purpose, this narrow subject that it's addressing. All right. What about Temple? Temple is. Let's assume just this. I don't want to do this. Assume you lose on Pitt. How do you win on Temple even if the court disagrees with your argument that the Pitt contract is not a fully integrated agreement? Well, I'd be hesitant to draw the distinction for the purposes of trying to win in Temple because I think we win in Pitt even with that integration clause. I know that. That's why that was a condition of the question. That doesn't relieve my paranoia. No, you're right. You drew the right distinctions, Your Honor, in Pitt versus Temple. In the Temple agreement, it only refers to registering for classes. So even less so, there's really no promise there by Temple to do anything of any meaning for the students in the real context that as common sense evaluation would reveal is what's going on between the students and the universities, which is paying for an education on campus and being taught by professors at the college. That's what's going on here. This isn't just about registering for classes. And it's not just about figuring out how I have to obligate myself to pay the University of Pittsburgh or Temple. It's about the whole exchange and the whole interaction in the course of dealing between these parties. And a common sense look at that reveals exactly what it is. This is not even a close call. Even at Rule 12, once you apply the right rule, this is not a close call. Why are we spending all this time talking about the FRAs? They weren't attached to the complaint, right? And to the extent there's actually a document that's attached to the motion to dismiss, is it undisputed in its authenticity? And is it related to the claims that are being made in the complaint? Or is it purporting to set forth a different contract than that asserted in the complaint? Your Honor, the Temple SFRA is not even in the record. It wasn't even attached for the court to see. They just gave it a hyperlink. And we had a hard time finding the hyperlink yesterday as we were preparing for this. So you're right. We made those arguments in our briefing. But, Your Honor, our case is so strong, even on – You made the arguments here. I didn't see anything in the district court record where you argued that the documents were inauthentic. The SFRA was inauthentic. It was some fraud or not really representative. And the pivot the district court made, in addition to saying that the SFRA was integral to the complaint, the district court also noted that you adverted, in your defense to the motion, you adverted to other documents that specifically referred to the SFRA. There's a couple of connected dots you have to go through to do that. Basically, it opens the door, by our argument, to the entire set of materials that we've been trying to get the court to look at the whole time, to cherry-pick. Well, if it opens the door to all those documents, then you're saying that it was fair game at Rule 12. It didn't mean that the decision as a matter of law should have happened, but it does mean that those documents were fair game for the district court's consideration. If it opens the door for all those documents, then we no longer have a fully integrated document. That one-page document from Temple is not fully integrated. It doesn't say it's even fully integrated. And that's a distinction that you've drawn out, and I agree with. But neither of these documents are fully integrated representations of the agreement here. And that's what they have to establish. Even to avoid a quantum error of analysis, they have to show that these documents were fully integrated and unambiguous. This document, at a minimum, even with the phrase educational services, is ambiguous. Nobody knows what educational services mean. Imagine the shock to find out, after you've committed to have Pitt call you on your cell phone to get your payment, that their educational services was one day of class and they sent you home after paying for a whole semester. Well, they concede that that wouldn't qualify as educational services. I think they said in their briefs that that would never happen because they're above that. So their good intentions now are going to be used to interpret contracts. That can't be how this works. I think the one day is the easy case. The harder case is what happens when you take a class and the professor comes down with some sort of illness that prevents her or him from coming to class. So you've got, you know, you sign up for this course. It's an upper-level course. It's in your major. It's sort of the marquee professor at the school. It attracts a lot of attention for that student in that major. And then you show up and you get two or three weeks of that professor. And next thing you know, they say, well, sorry, I'm immunocompromised or what have you, and I'm not coming to class anymore. I'm just going to see you on TV. My daughter told me last night that Penn State is having a snow day today. Okay, so she's not going to class today. That's not a breach of contract. These things happen, right? Right. So there's a continuum here, right? Yeah. These students paying for an entire semester of in-person, on-campus education and not getting it. They only got nine weeks. They only got nine weeks. Well, but you don't want a full refund for the rest because you got something. So how do we measure damages? What about the uncertainty of what the damages would be? So there's not any uncertainty on the fact that damages have occurred here. There may be at this point in time, because I'm still arguing whether I have a valid complaint, there may be some uncertainty as to what the scope of the damages are and how they would be calculated. I'll be consulting with some experts on that, and there's some different theories in play. But I think at the end of the day, if they invoke an impossibility of performance defense or whatever they plan to do, or I rely on an unjust enrichment claim, then maybe it'll be a quantum merit analysis, and maybe they'll have to look to see what the cost was that was incurred to do what it is that they did do versus what they promised to do, because they clearly didn't do what they promised to do. And when I say that, I'm talking about an implied contract. And the way you distinguish between only nine weeks of class for a whole semester as being a violation of an implied contract versus a snow day is the jury decides. They look at the course of dealings. They look and they try to decipher the common understanding of the parties based upon the history. That's what the jury's role is. In this Court, in both courts, they stripped the jury of that opportunity, and they stripped us the opportunity of developing a record to substantiate those arguments to show this is actually a promise that's enforceable as opposed to missing a snow day. There's a distinction. Roberts. We'll hear you on rebuttal. Thank you, Mr. Lynch. Mr. Martin. Thank you, Your Honors. James Martin for the University of Pittsburgh. As the Court has indicated, there are two issues here related to Pitt. One is the express contract, which we suggest is controlling on the subject matter here. It's fully integrated. It's bilateral. It contains mutual promises. As to the Court's point about is it in the record or not, it was plainly in the record on the motion to dismiss. It was integral to resolving it, and there is no— Integral to your defense of the— I'm sorry? It was integral to your defense. I agree with that. Why was it integral to the plaintiff's well-planned complaint? Well, because under the Burlington Coat Factory decision of this Court, which talks about the relationship of matters outside the complaint to the complaint, if it's integral to the resolution of the issues in the complaint, it's not disputed as to authenticity, and the resolution of the claims would turn on that, then you can't plead around it and the defendant can properly bring it in. So why does the resolution of the claims turn on the FRA? Because the express contract here, which is bilateral and integrated and mutual, covers the entire subject matter of the dispute. It covers registration, tuition, which is a payment in exchange for instruction or teaching. It covers educational services, which clearly were delivered here from start to finish. And finally, it has refund provisions, which is what this dispute in the end is about. They want a refund. Why couldn't educational services be the subject of multiple interpretations? So let me say a couple things about that. The first is, in the Pitt case, there is no breach of the express agreement that's alleged. So this ambiguity argument, which is injected for the first time on appeal, might relate to the construction of the FRA, but the construction of the FRA is not a part of the dispute because they're not suing under that agreement. But if we... Not suing under the agreement, then. What, are we talking about the FRA? No, no, because the agreement is dispositive of the relationship. Pennsylvania law provides, Your Honor, that if there is an express agreement that covers the party's relationship, you don't have an implied agreement that occupies that same space. And we know that because there is an agreement out there that the party's entered into that contains the phrase educational services, and we know that the educational services must mean only registration and payment, and therefore we're done. This is all your defense, and I understand why it's the defense you want to make, but I don't understand that that's the complaint that they've filed. And so where I'm getting confused in is why we're not going with what are the allegations. So let's start with the premise that if there is an express contract that covers the dispute, under Pennsylvania law that's dispositive, and you can't imply a contract in the same space. That's the Martin case, that's the Bear case, it's the Turkmeister case, the Robinson case that we cited. So our argument based on the express agreement is it's controlling. Okay, now at that point you have to look at educational services and decide whether that affects the enforceability of the agreement. It doesn't. The fact that educational services is undefined doesn't mean we don't have a contract. We do. The fact that they say it's vague doesn't mean, or it's undefined, doesn't mean it's vague or ambiguous. Educational services has an ordinary meaning, and Pennsylvania law would prefer that meaning. What is the ordinary meaning? So the ordinary meaning of educational services is exactly what was provided. It is teaching and instruction, which plainly was provided here. That's within the ordinary scope of the meaning of educational services. It would be the preferred definition adopted. But let's take it one step further, Your Honor, on why there's no fact issue on this here. A fact issue on this would have depended on the introduction of extrinsic evidence to construe this term educational services. That was not introduced in the district court, and it doesn't exist in this case. The district court looked at the extrinsic evidence that was offered and found that it didn't convey a promise at all, much less a promise of a certain type of education. How do we have a district court that's looking at documents that they're hearing in at least one motion to dismiss, not necessarily the other, but also looking, as you're describing it, to extrinsic evidence to make determinations under Rule 12? No, but that's the point.  It doesn't apply to the interpretation of the agreement because it's not relevant to the usage of the phrasing. Or alternatively, if it doesn't give rise to a construction that would result in a promise, then it's not relevant in a contract dispute, and of course the court would be proper in rejecting it. It's the same analysis that's actually applied under Swartley. Is there a specific? That's why you have to lean heavily, I think, on the promotional materials not being a contract, because if they were, then that has to be considered as well. You can't just look at the FRA to answer the question. Likewise, you have to assume that they don't in any way inform the meaning of educational services or university services because that, too, would create an interpretive challenge. But then we would have a fully integrated agreement with nobody suing under it that extends to the dispute, and under Pennsylvania law, that would be dispositive. We'd stop the analysis. If we want to go further, it's the only written agreement that exists in this case that covers the issues. It's the. . . Doesn't that beg the question? What we have here is called a promissory note, and it says it's integrated, but only as to the matters that are covered. Right. With a reading that seems quite plausible that the matters covered are simply the students' promise to pay. So the matters that are covered are registration, which the student does, tuition. Tuition is, in ordinary parlance, payment for teaching or instruction, and it's in return for educational services, which clearly, in ordinary parlance, it can be. . . Actually, it doesn't say. . . I was mistaken. I led everyone down the wrong path. It doesn't say educational services. It just says receipt of services. No, educational services is in that paragraph, Your Honor. Well, it says educational loan. No, keep going. It's. . . Where is it? Oh, I'm sorry. There you go. It's later. Thank you. Yes. So. . . I'm going to correct my mistaken correction of my reading. Okay. So what we would need is extrinsic evidence, Your Honor, that is relevant to the construction of educational services. The fact that it's ambiguous doesn't deprive it of being a contract, right? And there is an ordinary meaning of it. I thought you said it wasn't ambiguous. No, no. You said it's general but not ambiguous. Didn't you argue that? If I said that, I misspoke. I said it has an ordinary meaning. In order to have any ambiguity analysis be relevant in this case, there would have to be the introduction of extrinsic evidence about the term educational services from the time of contracting that established a meaning that the plaintiffs want. That's the evidence they don't have. Even under your view of what the district court could properly consider. . . Right. Help me with this hypothetical. Even under your view, it would have been possible for a district court to write an opinion that says, When I look at this contract where on the one side is the obligation to pay, on the other side is to educate. . . Right. Educational services means in person rather than virtual. So theoretically, a district court could have written that opinion as a matter of law, right? Not in this case, Your Honor. Why? Well, for two reasons. Because one, if educational services doesn't speak directly to in-person education or virtual education, then it's subject to interpretation. But that wouldn't mean. . . That would then mean, if it's ambiguous, that you would need extrinsic evidence. . . Oh, okay. . . . to establish the promise that the plaintiff wants. In-person education under any circumstances or here exigent circumstances. Right. Then you'd really be in trouble because every student at the school would file an affidavit saying, I expected an in-person education. And that evidence doesn't exist. The contemporary evidence at the time of the contract is the promotional materials. It's the core values. It is nothing that would lead you to the construction that you talked about. But if it's ambiguous, though, then we have to remand it. If educational services is truly ambiguous, that it's equally plausible or somewhat equally plausible that it means in-person or virtual, then that's what discovery is for. Okay. So my first response on that is the one that I started with, and I see I'm out of time. Can I finish? We don't want to start holding people into light at this stage. So we have established that this is an enforceable bilateral conduct that covers the same subject matter as the plaintiff's lawsuit. Now, the plaintiffs are not suing for a breach of that contract. There is nothing to remand. They are suing for a breach of implied contract that is their own invention that they say is not displaced by that contract, and we say as a matter of law that it is. On that implied contract side, just quickly, express an implied contract. We're still talking about a contract. How do you get a promise? And in this case, under Swartley, in the cases that have followed, you get a promise if there's a specific and identifiable written promise in the materials for the in-person education under any circumstances that the plaintiffs want. And as the district court concluded, if we go back and unpack that extrinsic evidence in our case, you don't find that promise. You find – Can we go back to the bilateral contract you say that you've established? So what exactly from the term educational services has the university promised to do on its side? So the question is, is what the university did within the ambit of educational services. There's no rule of contract instruction that says we would have to define every piece of that from the standpoint of a modality to make it a contract. But you're trying to persuade us this is bilateral. In what way is it bilateral? Okay, I'll give it one more try. So the students register. That's the first act. The second thing is they pay tuition. Tuition in ordinary parlance is money that is paid for instruction or education. In return, the university provides educational services. There is no dispute in this case that what the university did, which was for two-thirds of the semester it had in-person, and for the last third it had exactly the same course content, same professors, same credits, same degrees. The only difference was the modality change. Does the university in this agreement, is it agreeing to provide a degree? It's agreeing to provide educational services, which we did. So someone could pay, if they paid tuition and at the end of it were not issued a degree, having met all of the criteria for that, they don't have any course of action because the contract they signed only entitled them to receiving instruction but not to, at the end of that, obtaining a degree. So Pennsylvania law has provided that implicit in the university-student relationship is the conferring of a degree if you meet the requirements and you pay your tuition and you take your courses in a satisfactory way. Where is that in the contract? That's the basic bargain of tuition for educational services. Your Honor, we don't have to... Where does that basic bargain come from then? The university-student relationship under this agreement, we would have... But it isn't in the contract is what you're saying? I'm saying... And I interrupted again there, Your Honor, and I'm sorry. It would be unworkable to expect in any commercial setting, including this one, that every piece of the bargain has to be in the contract to make it enforceable. So here, there is enough here for a bilateral mutual agreement which Pitt did not breach. They don't say that we breached it, and the reason they don't is what we delivered here was educational services on this fact pattern. Why wouldn't it be workable? And why couldn't you have a contract that you enter into with each student that says the university agrees to provide core educational instruction in return for tuition and the conferral of a diploma? All other materials are provided merely for promotion and provide no basis for any implied or actual contract. All you get is a course and maybe a diploma. Right. I mean, I suppose that doesn't sound all that unworkable to draft that. No, but that doesn't make this contract unenforceable. It's a different contract that maybe is more specific, but that, again, there's no principle of contract instruction that requires that kind of specificity. You're saying it was unworkable. What are all the other materials then? We call them promotional materials. Right. So if you look, yeah. I don't need specific examples. How would you characterize their legal import? What is their purpose in the relationship between the students and the university? So, again, we're coming back to a contractual promise, a specific and identifiable written promise in writing as required by Swartley, Bermundi, and the cases. A specific promise in writing in the materials might be something along the lines of if you enroll in these courses, we'll provide a tutor, and we don't provide the tutor. If you enroll in these courses, you will get an accredited and licensed degree, and we don't provide the degree. So what we're looking for in this case is something in those written materials that says you will get an in-person education and, more specifically, an in-person education in the face of exigent circumstances. And, obviously, the university has to have discretion to deal with changes in buildings, changes in professors, that sort of a thing, and that is not in any of the materials that the plaintiffs have provided. They've provided statements about core values, about the goals of the university, about the value of on-campus experience, but nothing that's specific to the modality of education or to the promise that they want to enforce. And that's where the district court found that this broke down as a matter of law, Your Honor. That extrinsic evidence could not create a factual dispute on the essential issue in the case, if we want to call it an implied contract. It's a contract, and what does it take for a contract with the university? They didn't meet the specifics of what they needed to for the contract they want to enforce, and on that issue, Pitt doesn't carry any burden. That's up to them. They have identified through fees, you know, identified particular fees, services that could only be provided in person. Right. Right? So the fees are subject to the same express contractual analysis that I talked about. There's nothing that says, that relates to that specifically. Also, the fees, again, it would take an express specific promise about the fees. They don't have that either. Yes, the fees are things that, part of them at least, would occur on campus, but that just begs the question. Is there an express contract that would require the return of the fees? No. Is there any kind of specific promise in the written materials that would affect those fees if the modality changed? No. So where do we go? If they want to go to unjust enrichment on that, again, the problem is twofold. One, we have contracts that cover the issues in general, so you can't go to unjust enrichment for that reason. Second, they've incorporated their contract allegations in time just enrichment, which further defeats that. And third and finally, the university delivered benefits under the circumstances. They, in fact, since it was the same course, same content, same professor, same credit, same degrees, it was, except for the modality, the university fully performed and the modality, as I said, there's no binding promise about that. And when you say those services for the fees are also covered by the contract, you're pointing back to the FRAs? Yes. As the contract specifies. Yeah, that's the bilateral agreement, right. Thank you, Mr. Martin. Mr. Rublin. May it please the Court, Burt Rublin from Ballots Bar on behalf of Temple. As a threshold matter, I want to emphasize that Judge Gallagher's opinion dealt with two issues. Number one, was the FRA dispositive of the implied contract claim? And number two, even if not, in the alternative, did the implied contract claim fail as a matter of law? So it's an accurate characterization to say he relied entirely on the FRA. So let me start my analysis with the FRA. It's been pointed out that Temple, unlike Pitt, does not have an integration clause. Nonetheless, this Court in the Mellon Bank v. First Union case, the Superior Court in the CARE Packages case, has recognized that a contract can be an integrated contract, notwithstanding the absence of an integration clause. And what are the hallmarks of integrated contracts that don't have an integration clause? If it appears from the face of the document that it's a final and complete expression of the party's agreement. And we submit that with respect to the financial relationship between the parties. And we don't suggest, nor did Judge Gallagher suggest, that this FRA encompassed every potential aspect of the student's relationship with the university. What we're focused on more narrowly is the financial relationship, in particular the payment of- Yeah, you want to get paid, but you need to provide them something in return. And I don't see educational services here. Point to us in this SFRA to the language where Temple is promising to educate these plaintiffs. All right. There is no- you're right. There is no mention of educational services. But there is a repeated reference to classes. And I would submit that by agreeing to allow students to register for classes at Temple University, that's the first sentence. And then the third sentence, I understand that I'm responsible to pay for all classes for which I am registered after the final day of the terms drop-out period. And then the next paragraph, I understand that if I'm not planning to attend, it is my responsibility to drop my classes as the university will not automatically cancel my registration. I think the clear and logical inference to be drawn from those sentences is that not only is Temple allowing the students to register, but it's also agreeing to provide the classes that are expressly referred to here. Indeed, there's a drop-out period that comes two weeks after registration. And students are entitled to a full refund if they drop the classes before the drop-out deadline. Now, if we were not providing any classes, there wouldn't be any reason for the drop-out date. I think it's a clear inference. And this court has repeatedly said that contracts should be construed in a common-sense, logical fashion. And I think it's a common-sense construction of this agreement that Temple, in exchange for the students' payment of the tuition, has agreed to allow the students to register and also to take the classes. Who would have thought, though, in the fall of 2019 that agreeing to attend classes meant logging on to Zoom? I will concur, Your Honor, that this was not within the contemplation of either the students or the university. And as I think, Judge Hardiman, you pointed out, it was anticipated and we've acknowledged in our brief. Temple anticipated and fully expected that classes would be in person, as the students did. But the fact of the matter is you can't find any commitment by Temple, nor would you expect one to be found, that irrevocably committed Temple to provide in-person instruction under any and all circumstances. So why doesn't that just point out the ordinary meaning of terms like classes or, you know, even the educational services that the plain meaning as understood commonly was in person? Well, I don't know that that would necessarily be the case, Your Honor. Classes have been taught in many different fashions, but there was indeed a reservation of rights provision in the Temple Bulletin, which we've talked about in our brief, which specifically said that all matters that were included in the Bulletin, including the description of classes, was subject to change. And so I think that contemplated the possibility, as one of the amicus briefs cogently pointed out. Universities have to deal with unforeseen circumstances and exigent circumstances all the time. You can't foresee with a crystal ball exactly what's going to happen. And so that reservation of rights we submit gave Temple the authority to make the change here. That would be very helpful if you're looking at, you know, what an implied contract and various documents that inform people's understanding of what the various promises were, or if you're trying to raise an impossibility defense. But where we're looking at just the FRA, how does that really help you? Well, I want to finish up on the FRA, and I'm going to jump into your point about the implied contract. Plaintiff's counsel suggested that the FRA is not in the record. There was no argument at the district court level by plaintiffs that the court acted improperly by considering the FRA. The plaintiff's complaint cited repeatedly to different hyperlinks, but most importantly it cited to the tuition and fees policy, which plaintiffs have acknowledged in the court below was incorporated by reference in the FRA. They never argued that the FRA was not an authentic document. So they've waived an argument that the court erred by considering the FRA. In any event, putting aside whether the FRA is dispositive or not, and we think Judge Gallagher got it right, but wholly apart from that, his analysis with respect to there are three arguments with respect to an implied contract claim. Number one, they argue that the marketing materials give rise to an implied promise of in-person instruction. Number two, they argue course of conduct, that for the first nine weeks of the semester, the students had attended in person, and that course of conduct gave rise to an implied contract. And number three, they argue that Temple provided online programs and that there's a price differential. So let me take them seriatim. Mr. Lynch made an observation at the beginning of his argument that Pennsylvania law is really no different from other jurisdictions and that Pennsylvania law with respect to contract claims against universities is no different from any other contract claim. Well, with respect to the argument that the contract law is the same against universities as it is in any commercial context, their own acknowledgment that at least putting aside that it has to be in writing, because they dispute Swartley's applicability here, but they do acknowledge, as they must, that there is a long line of cases, including several cases from this court, that say there has to be a specific and identifiable promise when you're suing a university for a breach of contract. Now, that's not applicable in a run-of-the-mill commercial dispute. That's applicable in the specific context of a claim against a university. And I want to talk about Swartley. Swartley, Your Honor, did arise in the context of a student who claimed that she was improperly denied her Ph.D. when they failed her on her defense of her dissertation. But Swartley was written very broadly by the court. They started the opinion by saying this is a case of first impression. The Pennsylvania appellate courts had not previously addressed whether a contract claim could be asserted against a university. And they decided, you know what, this case presents us the opportunity to answer that question. And they wrote broadly, it's not a fact-specific case. It didn't confine itself in any fashion to disciplinary context, to withholding of a degree. But they wrote broadly. And, in fact, I think it's notable, Your Honors, that by my last check the other day, Swartley has been cited 117 times by state and federal courts. It was cited several times by the Gotti case, Gotti v. University of Pittsburgh, upon which the plaintiffs place heavy reliance. And I do think it's notable, in the wake of Swartley, which repeatedly said that the contract is comprised solely of the written documents that are given to a student, that putting aside the Point Park decision by the magistrate in the Western District of Pennsylvania, which is the only tuition and fee case that has allowed the case to go past the motion to dismiss stage, all the other six cases, and we cited this in our 28-J letter, have relied on Swartley for the proposition that there has to be a specific, identifiable promise in writing. But there has not been a single case from either the state courts of Pennsylvania or the federal courts, in the wake of Swartley, that has allowed an implied contract claim to proceed. There's a first time for everything. But I would submit, Your Honor, that when the Superior Court has spoken, and that decision has been followed repeatedly by the Pennsylvania courts, that this Court, in predicting what the Pennsylvania Supreme Court would do, should look and accord some degree of deference to the Swartley decision. It's not an outlier. No, no. I mean, it does, it holds that it's contractual. It holds that a student can bring a cause of action against an institution for breach of contract where the institution ignores or violates portions of the written contract. The reason why the plaintiff lost in Swartley was because she could not identify a provision that was violated. Right. I'm not sure how, when you said solely the written materials provided to the students, I'm not sure how that helps you because there are other written materials provided to the students besides these promissory notes. Yeah, let's talk about that. You've argued that they're not contractual. They're puffery. They're, you know, hey, you know, come, we're going to win ten football games next year, and we have great sororities and fraternities, and, you know. No, our argument is. And, of course, when they close the fraternities because of hazing, you're going to say, well, that's not a breach of contract because they didn't promise the fraternities would be up and running. We're not arguing puffery. Our argument is much more refined than that. What we're arguing, and if you look at the plaintiff's briefs, I found it particularly noteworthy that their opening brief devoted just one paragraph to the marketing statements, and the reply brief said nothing about the marketing statements. I think that speaks volumes, and that's because when you look at the statements that they quoted from the marketing materials, this is from paragraphs 80 and 81 of the Temple complaint, they say nothing, absolutely nothing about the mode of instruction. They talk about the vibrant, bustling center city campus. They talk about state-of-the-art buildings. They talk about the library. They talk about the performing arts center. There's not a single word, much less a specific and identifiable promise, about the mode of instruction at all, much less that classes will always be taught in person. And by the same token, there's no promissory language at all that the campus will always be kept open under any and all circumstances. I found it very ironic that the plaintiff's brief made much of the fact that there's no promissory language by Temple in the FRA. There is absolutely no promissory language in these marketing materials, none. One other point with respect to marketing materials, Your Honors, Judge Gallagher noted that there's a line of Pennsylvania cases that deal with public universities, such as Temple and Pitt. The leading case is an en banc unanimous decision by the Commonwealth Court of Pennsylvania, Tron versus System of Higher Education, that says unanimously that a student handbook does not constitute a contract in the context of a claim against a public university. And we submit, Your Honors, that if a student handbook doesn't constitute a contract against a public university, a fortiori, the marketing materials don't either. With respect to course of conduct, where is the specific identifiable promise of in-person instruction to be found in the fact that there was prior in-person classes? That's not a specific identifiable promise, much less is it in writing. Again, they can't cite to any case other than Point Park. And Point Park is an aberration. It didn't cite any prior precedent from Pennsylvania allowing a course of conduct claim to proceed. It relied on cases from other jurisdictions with different law. And, in fact, there have been three tuition and fee cases in Pennsylvania subsequent to Point Park, not one of which has decided to follow it, recognizing that it's an aberration. It's just not consistent with Pennsylvania law. Finally, Your Honors, with respect to online instruction, again, the same problem that plaintiffs had with respect to the marketing materials and the course of conduct. Where is the specific and identifiable promise? Put aside in writing. But where is the specific and identifiable promise that because we offer certain online programs in fields other than what the students are taking, these two students were in public health and criminal justice, it's apples and oranges. The fact that we have an online program doesn't mean we are irrevocably committing to the students who are taking in-person classes that come a hell or high water, to borrow the phrase that they use in their brief, we will always provide in-person instruction, whatever the circumstances. It doesn't have to go that far. I mean, I thought I heard you earlier say that no one at the time these contracts were entered into, the FRAs were signed, thought that classes meant online education. It was an unexpected and unforeseen circumstance. But doesn't that sort of prove the point that what the parties intended when they got into this, let alone committed to receive something like university services, which is much harder to pin down, is a matter of fact that needs to be developed? No, I respectfully disagree, Your Honor. I think that given the reservation of rights, given the respect for academic freedom, this Court alluded to in the McKinney v. University of Pittsburgh case, Swartley alluded to it. In fact, Swartley cited the Ombank opinion by Shulman that talked about the reluctance of courts to second-guess and interfere with academic decisions. And I do want to talk very briefly, and I know my light's on, but please indulge me. You're reading that the provision of classes in person is a matter of academic freedom? Yes. If a constitutional law professor, highly regarded and particularly skilled in the Socratic method, and is very adept in class at having the dialogue with students, falls down on a skiing accident and has to, say three weeks into the semester, has to teach the rest of the semester online, I don't think we want to open the door to an implied contract claim because the students who are looking forward to having that Socratic dialogue with the professor in the classroom now have to have online. Let's put aside a hypothetical. Let's talk about a real-world experience. Sixteen months ago, Hurricane Ida hit Philadelphia, and in particular, it spawned a tornado that devastated Temple's Ambler campus in Upper Dublin. All but two of the 18 buildings were heavily destroyed. This is in September of 2021. Temple, which had returned to in-person instruction, had to go back to online instruction for those students. For a couple of weeks, they had no choice. The buildings were damaged. There was water everywhere. And on top of that, a number of the buildings stayed closed for weeks and months thereafter. Now, if we start down the slippery slope of allowing implied contract claims because of those kinds of exigent circumstances, that's going to, you know, create a real problem for the state's schools and universities. But under your theory of the FRA, if there were no classes, virtual or in-person, then the students would be entitled to a refund because that's what they bargained for was classes, correct? Correct, and that's what they got. You're just saying in a perhaps overly simplistic way, this case comes down to whether somebody agrees that an online college education is actually a valid educational service or class. You're saying it is. And they're getting the credits and they are graduating. And what's interesting here, Your Honor, is the plaintiffs are taking pains because of the educational malpractice doctrine not to say that this is a subpar education. Well, give them credit for that. Yeah, well. Last question, what did you do with the $16 million in CARES money? Was that all spent? I mean, that's one reason I'm sure they'd like to get under the hood and see, did the universities actually make money off this deal? Well, no, there's a lot of commentary about how adept the universities were in pivoting to online, and, you know, that certainly is warranted. But that doesn't answer the question of whether it was actually more profitable for the schools to be providing an online education. Well, that's going to be asking me to address matters outside the record. I think the amicus brief. Wasn't it in the record that you got $16 million in CARES money? I read that somewhere. There's an allegation to that effect. There's also some briefing in the court below about where that CARES money went to and how Temple fared. Last point as to since you've raised unjust enrichment, there is a pleading deficiency that Judge Gallagher identified with respect to their unjust enrichment claim that they have not addressed in either one of their briefs, and that is that they incorporated by reference in their unjust enrichment claim all the preceding breach of contract claims. There's a Superior Court case called Quadjara v. Remax that says as a matter of Pennsylvania law, you can't do that. You can't have your cake and eat it, too. You can't assert a breach of contract claim and then use that as the predicate for an unjust enrichment claim. The only reason I'm mentioning that very quickly is that two months ago, the Superior Court addressed that same issue and once again said that that is a pleading deficiency. And they relied on the Quadjara case. You can't rely and incorporate by reference a contract claim and expect to then proceed with an unjust enrichment claim. Toppy v. Passage Bio, 285A3-672, Superior Court, November 9th. But if we reverse and remand, that's a pretty quick fix with an amendment to the pleadings, right? Well, interestingly, in terms of, again, waiver, in their briefing in this court, they have never said that the court erred by denying them leave to amend. They never saw it leave to amend. And so that's, I think, the answer to your question. But, you know, I just want to summarize that the implied contract claim, I think, is inconsistent with Swartley. So regardless of whether you feel that the FRA is dispositive, I think the implied contract claim fails on its own right. All right. Thank you, Mr. Rublin.  Rebuttal, Mr. Lynch. First, I just want to say, with all due respect to Mr. Rublin, our position here is a lot less painful than the position they've taken with their contract interpretation. With regard to the waiver, that allegation of waiver on the incorporation of the contract claims, implied contract claims in the unjust enrichment section, that's the first time I've heard that argument in this litigation. So I imagine that might be waived. The reservation of rights argument. Very quickly, I'm going to read the reservation of rights that was quoted for the court in the briefing by Temple. The information in this bulletin is subject to change by Temple University at any time, ellipsis. All prospective and current students should consult with appropriate university offices to verify current information in the status of policies, programs, descriptions of curricula, or other information in this bulletin. Now let me read you what the ellipsis is. Neither this bulletin nor any parts of it may be relied upon as a contract between Temple University and any student, applicant, or user of this site. So there's a pattern here. They seem to want it both ways. They want it locked down on an express contract when they think it benefits their litigation position. Then they run from it when it doesn't. And our point is simple. This is, at the end of the day, every university, it's an implied contract. These financial documents that we're talking about that bind the students to pay, they in and of themselves might be in agreement on the issue of the student paying, but the entire contract is not that. The entire contract is implied. It's an implied contract. You are really encouraging us to open up a can of worms where every disgruntled student could sue and say this professor is over the hill, it wasn't what I thought. You know, the last, you know, when my older sister came here, the football team was undefeated, and now they fired the coach and don't win any games. You used to have a really nice dorm system, and now the whole campus is under construction, et cetera, et cetera, et cetera. I mean, can that really be the law? Well, it might not be the law. It's the contract.  These parties choose. No, but you're asking us to say it's an implied contract. This is not a written contract. You're saying it's implied, in fact, right? Yes. Well, then, all the hypotheticals I just threw at you, aren't they all fair game for litigation? Because it, in fact, is an implied, in fact, contract. So the answer is yes, it is. Yes, because that's the arrangement. It is. Okay. That's the arrangement of the parties here. So when the school says in the promotional brochures, you know, we're the Division III reigning champion in ice hockey, and for the last three years, and the kids have a great time going to the games, and then, you know, after the student pays tuition, because of Title IX or some financial decision, they cancel ice hockey. Now the student can say, I'm out. It's a breach of contract. They cancel your ice hockey team. Your Honor, that's where we introduce the concept of plausibility. So you can make up hypotheticals. One of the courts I was in front of used the example of, what if there was traditionally an ice cream social on the first day of school, and now you didn't have your ice cream social. Can you sue for that? Because there's nowhere it's promised in writing. So that's what plausibility is. You're saying yes. No, I'm not saying yes. So you're saying ice cream social is too de minimis. I'm saying that they're, yeah. But a lot of other, I mean, is a Greek system too de minimis? Fraternity sororities? Excuse me? Is the school having a Greek system, fraternities and sororities, is that too de minimis? Your Honor, I think that's for the fact finder after a plausibility trial. Oh, so every one of these cases will go to trial then. I don't think those cases will get filed because if they're not valid. What if they did? I mean, I took your argument to be that ultimately what's here, if you're looking at the written agreements, is that educational services and university services are too capacious and unknown without getting into the intent of the party. So I understand that maybe there are certain claims that might arise under these contracts, but I would imagine that in the future you could have a different contract, for instance, that better explained what educational and university services were, and by better I mean with more specificity to exclude the endless parade of horribles we can come up with and then those claims can't be filed, right? Your Honor, that was exactly the point that I was trying to articulate. Thank you for helping me with that. My point is simply the parties are free to interact contractually however they choose to interact. These universities can reduce the student-university relationship to a specific writing. They've chosen not to do that for years. They've created the implied contract scenario that we're dealing with. They're not bound to do that in the future. So all the hypotheticals, the parade of horribles that the Court has gone through, those can all be eliminated in one fell swoop with a contract. All right. So, again, your case comes down to the premise that the FRAs are not contracts. They're not enforceable contracts. If they claim they're contracts, they're not enforceable. If they're enforceable, they're enforceable on the provisions therein. It has nothing to do with the implied contract that we're alleging here. There's no overlap between the two. We're not occupying the space of those FRAs with our claim. That's the test. And then very quickly, with regard to this idea of specific and identifiable promise, this is the error they made with regard to analyzing it as an implied contract.  Specific and identifiable promise doesn't talk about an implied contract analysis. That's about an express contract where you're looking for a particular promise. If you go looking for an identifiable promise, an information that's being relied upon to infer a promise, you're never going to find one. And that's the problem that they encourage the District Court to go looking through all the promotional materials and the other materials that we cited to, looking for a promise. Well, that doesn't make any sense. It's an inferred promise. It's not an actual promise. If he could find, if the judge found one that he said was a promise, we'd have an express contract. An inferred promise, an implied contract, requires the inference of that promise. You're not going to find it specifically in any of the information you look at. And also, when you go down that rabbit hole, you've excluded our main purpose for using an implied contract theory, which is to open the discussion on the course of dealing and the history and the common understanding of the parties. That's where the inference is going to come from on what is really the understanding of the parties here, what is the real intent to contract. And it won't include the ice cream social, Your Honor, and it won't include many of the other things that you suggested. It will include the elite professor who gets laid up in the skiing accident. It will include the physical plant of the campus, whether it's being torn up because of construction. It would include all that, right? Yeah, and that takes me to a point that I want to make very quickly. Force majeure clauses exist. We know how to write them, and then we know how to put them in the contracts. They don't have to even document the entire contract to throw one of those in, and there isn't one. Even in the document they claim is the written contract, not in there, could have been in there, not there. So that's all I have to say. Unless the Court has any other questions.  Thank you very much. Thank you. Thank you all for your stamina today.